**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
Civil Action No.: 1:26-cv-884

| | |
|---|---|
| STEVEN B. WALL and TODD DEAN, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>UNICHEM SPECIALTY CHEMICALS, LLC; ELEVATE TEXTILES, INC.; SHAWMUT PARK AVENUE, LLC; REPUBLIC SERVICES OF NORTH CAROLINA, LLC; SYNAGRO CENTRAL, LLC; EMA RESOURCES INC.; ALAMANCE COUNTY; CITY OF BURLINGTON; and CITY OF GRAHAM.<br><br>Defendants. | Jury Trial Demanded |

# **NOTICE OF REMOVAL BY REPUBLIC SERVICES OF NORTH CAROLINA, LLC**

Defendant Republic Services of North Carolina, LLC ("RSNC"), by and through undersigned counsel, hereby files this Notice of Removal ("Notice"), pursuant to 28 U.S.C. §§ 1442(a)(1), 1332(d), 1446, and 1453. RSNC is entitled to remove this action based on federal officer jurisdiction and the Class Action Fairness Act ("CAFA"). As grounds for removal, RSNC states as follows:

## PRELIMINARY STATEMENT

1. Plaintiffs Steven B. Wall and Todd Dean ("Plaintiffs") seek to hold RSNC and other Defendants liable for alleged per- and polyfluoroalkyl substances ("PFAS") contamination of groundwater, well water, and soil on and under their properties. Specifically, Plaintiffs allege that Defendants' storage, disposal, and/or discharge of PFAS or PFAS-containing waste caused the alleged contamination. *See* Compl, ¶¶ 58–66. Plaintiffs also allege that their properties might be contaminated by 1,4 dioxane "among other hazardous substances." *Id.* at ¶¶ 224, 233.

2. Plaintiffs allege that "Republic Landfill"[1] (hereinafter, "Upper Piedmont Landfill" or "Upper Piedmont") stored wastes in such a way that resulted in the release of PFAS and hazardous substances into Plaintiffs' groundwater, well water, and soil. *See* Compl, ¶¶ 61. One of the alleged sources of the PFAS on Plaintiffs' property is the PFAS-contaminated waste allegedly disposed of at the Upper Piedmont Landfill. *Id* at ¶ 157. RSNC receives "pass through" PFAS, as well as other potential substances, incidentally through the disposal of certain wastes at Upper Piedmont Landfill.

3. Some of the PFAS and other substances underlying Plaintiffs' claims would stem from federal government waste disposed of at Upper Piedmont. Upper Piedmont accepted remediation waste impacted by PFAS and other substances at the direction of the

[1] Plaintiffs do not identify, either by name or by address, which RSNC landfill to which they refer in the Complaint, and RSNC does not own or operate a landfill in Alamance County. For purposes of this Notice only, RSNC presumes Plaintiffs are referring to the Upper Piedmont Environmental Landfill located at 9650 Oxford Road, Rougemont, NC 27572, in Person County which is adjacent to Alamance County.

federal government from federal cleanup projects. Thus, Plaintiffs' claims relate to RSNC's federal activities. Accordingly, RSNC is entitled to remove this action to federal court under federal officer jurisdiction.

4. To the extent RSNC caused or contributed to the alleged contamination of Plaintiffs' properties, which RSNC denies, RSNC's alleged discharge and disposal of PFAS-containing products or PFAS-contaminated waste streams, as well as other substances, was related to disposal of wastes containing these substances generated during remediation activities for the federal government at least two separate locations. Specifically, remediation waste including excavated soils generated by (1) the U.S. Army Corps of Engineers ("USACE") from the Tarheel Army Missile Plant ("TAMP") and (2) U.S. Environmental Protection Agency ("EPA") from the Cristex Drum Superfund Site ("Cristex"). Additionally, RSNC may have received waste from the federal government from other cleanup sites, including the GMH Electronics Superfund Site, the Olde South Road Site, the American Warehouse Site, and the Guilford Plating Site, as well as from the Federal Aviation Administration. RSNC is still evaluating the additional federal wastes and may further supplement this Notice.

5. Thus, under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), RSNC is entitled to remove this action to have its federal defense adjudicated in a federal forum. Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129,

133 (2d Cir. 2008); *see also W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 299-300 (4th Cir. 2022) (citing *Watson v. Philip Morris Cos., Inc*., 551 U.S. 142, 154 (2007)).

## PLAINTIFFS' ALLEGATIONS

6. Plaintiffs filed this action on July 23, 2026, in the General Court of Justice, Superior Court Division, Alamance County, Case No. 26CV004657-000 ("Complaint").

7. The Complaint alleges that the named-Plaintiffs are residents and property owners in Graham, North Carolina. Compl. ¶¶ 3–4. The Complaint further alleges that Plaintiffs' own properties that draw their drinking water from groundwater that is part of the Haw River Basin. *Id.* at ¶ 169.

8. Plaintiffs seek to "recover damages suffered by Plaintiffs due to contamination of [their properties] with hazardous substances including [PFAS]." *Id.* at ¶ 1. Plaintiffs assert that their groundwater and well-water have "unsafe" levels of PFAS, which has harmed the use and enjoyment of their property, *id.* at ¶¶ 206–232. Plaintiffs seek compensatory and punitive damages, specifically including costs for PFAS removal and remediation and filtration equipment. *See id.* at ¶¶ 321–323, 326–331. Plaintiffs also seek injunctive relief ordering the remediation and prevention of PFAS releases. *Id*. at ¶ 324.

9. Plaintiffs assert claims against various defendants (including RSNC), all of which allegedly discharged PFAS and "other hazardous substances" into the waters and soils of the Haw River Basin either directly or indirectly. *Id.* at ¶¶ 60–64. Relevant to

RSNC, Plaintiffs allege that RSNC "stored these dangerous compounds in such a way that their release has contaminated Plaintiffs' groundwater, well water, and soil with PFOA and PFOS [types of PFAS], among other hazardous substances." *Id.* at 61.

10. Plaintiffs assert claims for strict liability under the Oil Pollution and Hazardous Substances Control Act (*id.* at ¶¶ 253–264); private right of action under North Carolina Littering Statute (*id.* at ¶¶ 265–276); negligence per se (*id.* at ¶¶ 277–286); private nuisance (*id.* at ¶¶ 287–291); trespass (*id.* at ¶¶ 292–299); negligence (*id.* at ¶¶ 300–306); and unjust enrichment (*id.* at ¶¶ 307–320).

## THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE MET

11. Venue for the removal of this action is proper in this Court pursuant to 28 U.S.C. §§ 113(b) and 1441(a) because the General Court of Justice, Superior Court Division, Alamance County, in which this case was originally filed is located within the Greensboro Division of the United States District Court for the Middle District of North Carolina.

12. RSNC is not required to notify or obtain the consent of any other Defendant in this action to remove Plaintiffs' action as a whole under § 1442(a)(1). *See Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Houser v. Ammco Tools, a/k/a Hennessy Indus., Inc.*, Civil Action No. RDB-13-1179, 2013 WL 3364377, at *1 n.5 (D. Md. July 2, 2013); *Freeze v. Coastal Bend Foot Specialist*, No. C-06-481, 2006 WL 3487405, at *2-3 (S.D. Tex. Dec. 1, 2006).

13. Pursuant to 28 U.S.C. § 1446(a), true and accurate copies of the operative Complaint and Summons are attached hereto as **Exhibit A**.

14. RSNC was served with a copy of the Complaint and Summons on August 3, 2026. This Notice of Removal is timely filed in accordance with 28 U.S.C. § 1446(b).

15. Pursuant to 28 U.S.C. § 1446(d), RSNC is serving a copy of this Notice of Removal upon all other parties to this case and is filing a copy with the Clerk of the General Court of Justice, Superior Court Division in Alamance County.

16. By filing a Notice of Removal in this matter, RSNC does not waive the rights of any Defendant to file joinders in this removal on these and other grounds, or to object to service of process, the sufficiency of process, jurisdiction over the person, or venue, and RSNC specifically reserves the rights of all Defendants to file joinders in this removal on these and other grounds, and to assert any defenses and/or objections to which they may be entitled.

17. RSNC's investigation into the matters set forth herein is ongoing. RSNC reserves the right to amend or supplement this Notice of Removal.

18. If any question arises as to the propriety of the removal of this action, following a period for further discovery into the matters set forth herein, RSNC requests the opportunity to present a brief and oral argument in support of removal.

**REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)**

19. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), RSNC is entitled to remove this action to have its federal government-related conduct adjudicated

in a federal forum. Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson*, 517 F.3d at 133. Government contractors may remove a case pursuant to the federal officer removal statute where "the acts for which they are being sued . . . occurred *because of* what they were asked to do by the Government," even if the acts were not "specifically contemplated by the government contract." *Id.* at 137-38 (emphasis in original).

20. Removal under 28 U.S.C. § 1442(a)(1) is appropriate where, as here, the removing defendant establishes that: (1) it is a "person" within the meaning of the statute who "acted under a federal officer," (2) it is being sued "for or relating to any act under color of such federal office," and (3) it has a "colorable federal defense." *Chevron USA Inc. v. Plaquemines Parish, Louisiana*, 608 U.S. ---, 146 S. Ct. 1052, 1057-58 (2026); *see also Maryland v. 3M Co.*, 130 F.4th 380, 388 (4th Cir. 2025), *cert. denied,* No. 25-517, 2026 WL 568301 (U.S. Mar. 2, 2026).

21. Federal officer removal affords defendants broad removal rights. *Maryland*, 130 F.4th at 387–88 (noting that the federal officer removal statute is "necessarily broad"). Accordingly, all statutory requirements should be "liberally construed" in favor of removal. *Id.* at 388 (quoting *Watson*, 551 U.S. at 142); *Isaacson*, 517 F.3d at 136. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999). This is because "[o]ne of

the primary purposes of the removal statute" is to have federal "defenses litigated in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

22. All requirements for federal removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that Plaintiffs' claimed injuries plausibly are at least in part caused by and/or related to the alleged disposal of waste incidental to activity performed at the behest of the federal government. *See, e.g.*, *Illinois ex rel. Raoul v. Monsanto Co.*, 2023 WL 130525, at *4 (N.D. Ill. Jan. 9, 2023). Accordingly, this case is properly removed to this Court.

## I. All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied

### A. RSNC Is a "Person" within the Meaning of the Statute.

RSNC is a corporation and therefore a "person" for the purposes of federal officer removal under § 1442(a)(1). *See Papp v. Fore-Kast Sales Co. Inc.*, 842 F.3d 805, 812 (3d Cir. 2016), (quoting 1 U.S.C. § 1) (the term "person" includes "corporations, companies, associations, firms [and] partnerships").

### B. Plaintiffs' Claims Are Based on RSNC's Conduct While "Acting Pursuant to the Directions" of the United States.

23. The requirement of "acting under" a federal officer is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson*, 551 U.S. at 143. The phrase "'acting under' is 'broad' and is to be 'liberally construed' in favor of the entity seeking removal." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) (quoting *Watson*, 551 U.S. at 147). Where, as here, a private person "help[s] or assist[s] federal officers fulfill a basic governmental task . . . that the government would

otherwise have to perform itself" it acts under a federal officer. *W. Va. State Univ. Bd. of Governors*, 23 F.4th at 301–02 (citing *Watson*, 551 U.S. at 152); *see also Papp*, 842 F.3d at 812. A relationship is sufficiently close if the federal officer exercises "subjection, guidance, or control" over the removing party. *Watson*, 551 U.S. at 151–52; *see also Caris MPI, Inc.* v. *UnitedHealthcare, Inc.*, 108 F.4th 340, 347-48 (5th Cir. 2024).

24. Here, RSNC meets the requirement of "acting under" a federal officer because the alleged contamination at issue stems from RSNC's acceptance of (1) waste from an area containing PFAS (and other substances) from TAMP and (2) waste from an area containing 1,4 dioxane (and other substances) from Cristex. RSNC's acceptance of waste from TAMP and Cristex was at the direction of the federal government.

**Waste Disposed from TAMP Under USACE Direction**

25. TAMP is a shuttered manufacturing facility located in Burlington, North Carolina, that manufactured "ground-based guidance systems, components, and [assembled] the U.S. Army's Nike missile systems." *Final Remedial Investigation Report*, Terracon and Northwind Jacobs, at 2-1 (May 22, 2023) ("Final RI Report").[2] TAMP fell under U.S. Army Aviation and Missile Command's jurisdiction in 1962. *Id.* TAMP's manufacturing processes involved chlorinated solvent cleaning machines, *id.* at 1-2, and metal plating operations, *Final Preliminary Assessment and Site Inspection of Per- and Polyfluoroalkyl Substances*, Arcadis, at 11 (June 2023) ("PA-SI").[3] These operations

[2] Available at https://aec.army.mil/Portals/115/TAMP/1_%20%20TAMP%20Final%20Remedial %20Investigation%20Report.pdf?ver=VBmiJeoajmH2YgmXB9Pimw%3D%3D.
[3] Available at https://aec.army.mil/Portals/115/PFAS/TAMP_PFAS_PASI.pdf?ver=3GKPg3c9b

contaminated TAMP and caused it to release contaminants to soil and groundwater which now require remediation. *See Interim Action Completion Report – Source Area Excavation*, Terracon and Northwind Jacobs, at 1-1 (Aug. 15, 2024) ("Interim Action Report").[4]

26. More specifically, in response to finding contaminated soil and groundwater around a waste oil transfer area ("WOTA") and a waste accumulation pad ("WAP") at TAMP, USACE decided to excavate and dispose of the soil in those areas. *See* Interim Action Report at 1-1, 1-2. USACE and its contractors excavated and disposed of 404.84 tons of contaminated soils at Upper Piedmont. *Id.* at 4-1. This is waste that the government would otherwise have had to manage and dispose of itself.

27. USACE investigated TAMP as a source of PFAS and identified two areas of potential interest—the Plating Area (TAMP Buildings 11 and 20) and the Industrial Wastewater Treatment Plant Area ("IWTP Area") (TAMP Buildings 23, 29, and 30)—where PFAS-containing materials were used, stored, and/or disposed. *See* PA-SI at ES-2–ES-3. "[P]ermeable grass and/or soil covered areas around the IWTP" were identified as potential contamination pathways. *Id.* Groundwater and soil samples taken from beneath the Plating Area IWTP contained PFAS concentrations.

28. Upper Piedmont received excavated TAMP soil taken from area of the Plating and IWTP Area. Interim Action Report at Figure 2; PA-SI at Figures 5-3, 5-4, 7-1.

---

KAW0wpSaFn_6g%3d%3d.

[4] Available at https://aec.army.mil/Portals/115/TAMP/3_%20TAMP%20IRA%20Completion%20Report%20-%20Source%20Area%20Excavation.pdf .

29. In accepting waste generated from activities directed by the federal government, RSNC acted under the direction, order, monitoring and supervision of federal officers.

30. First, federal direction is demonstrated through the activities, plans, and documentation directing disposal of waste generated by USACE at Upper Piedmont. The USACE's plan included excavation, transportation and disposal of excavated material to appropriate facility(ies).[5] Remediation activities at TAMP are governed in part by approved environmental work plans prepared on behalf of the federal government.[6] USACE directed that the remedial waste be disposed of at Upper Piedmont Landfill. *See* Interim Action Report at 3-1.

31. Under USACE policy, it must "minimize the need for RCRA permits through use of offsite . . . disposal facilities" and it cannot "engage in onsite disposal of hazardous waste, industrial waste, municipal solid waste, or construction/demolition waste." USACE Environmental Compliance Policies, ER 200-2-3 ¶¶ 9-1.b, 9-2 (Oct 29, 2010).[7] As such, any remediation waste generated by USACE must be disposed of at offsite regulated disposal facilities like Upper Piedmont.

---

[5] Interim Remedial Action Update, Former Tarheel Army Missile Plant, Presentation by U.S. Army Environmental Command (Jan. 24, 2024), https://burlingtonnc.gov/DocumentCenter/View/25571/TAMP-22-JAN-Info-Meeting-Presentation-NE.

[6] Tarheel Amry Missile Plant, Installation Action Plan Final (June 2024) https://aec.army.mil/Portals/115/IAPS/24IAP-NC-TAMP.pdf?ver=L2tL9XxTgnorB9xbRpQffQ%3d%3d.

[7] Available at https://www.publications.usace.army.mil/Portals/76/Publications/Engineer Regulations/ER_200-2-3.pdf.

32. USACE officials (in connection with their remediation contractors) completed and executed a Special Waste Profile directing disposal of the USACE waste at Upper Piedmont. *See e.g.*, **Exhibit B**, Special Waste Profile for TAMP Excavation Waste (excerpt) (showing USACE as the waste generator) ("TAMP Special Waste Profile"); **Exhibit C**, Agent Special Waste Disposal Services Agreement for Non-Hazardous Substances for TAMP (Feb. 29, 2024) (detailing further requirements and conditions on Upper Piedmont's acceptance of TAMP waste). The Special Waste Profile and manifests are certified by a USACE representative that selected Upper Piedmont for the disposal of that waste generated from TAMP. *See* TAMP Special Waste Profile. As part of the special waste approval process, the federal government and its contractor conducted a detailed evaluation of the waste composition and physical characteristics, including laboratory analytical testing, and completed a detailed form and certification of *each* waste. *Id*. The Special Waste Profile directs the disposal considerations for the waste, such as whether it needs solidification or landfill disposal, or contains characteristics that warrant special handling. *Id*. The Special Waste Profile provides RSNC with information needed to manage the waste and ensure it complies with RSNC's and the federal government's disposal requirements. *Id*. No TAMP-remediation waste could have been disposed at Upper Piedmont without the approval of the federal official and completion of a Special Waste Profile signed and certified by the federal official and RSNC. *Id*. Thus, the documentation and specifications demonstrate compliance with USACE requirements, including

supervision and monitoring of waste disposal and disposal site selection that depended upon RSNC to perform disposal at Upper Piedmont on behalf of USACE.

**Waste Disposed from Cristex as Directed by EPA**

33. Cristex is a former textile plant located in Oxford, North Carolina where industrial processes included dyeing using metals and cleaning with chlorinated solvents. *Explanation of Significant Differences, Cristex Superfund Site*, at 2 (USEPA July 2022) ("ESD").[8] Due to contamination caused by the manufacturing, the site was listed on the National Priorities List under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") in 2013 and must be remediated. *Id.* EPA is responsible for the remediation at Cristex. **Exhibit D**, *Record of Decision*, *Cristex Superfund Site*, at 5 (USEPA 2017).[9]

34. Like the TAMP remediation, the disposal of excavated soil in RCRA Subtitle D landfills—including Upper Piedmont—is central to the selected remedy for Cristex. Part of the remedial action in the Cristex clean-up was to excavate contaminated soils which would then be "transported off-site for disposal at a permitted RCRA Subtitle C or D landfill. ESD at 4; *see also* **Exhibit E**, *Final 100% Remedial Design, Basis of Design Report*, Black & Veatch and Ecology and Environment, Inc., at 9-1 (September 2022) ("RD Report") ("Following approval of the EPA and the proposed Subtitle D landfill, the non-

---

[8] Available at https://semspub.epa.gov/work/04/11174321.pdf.

[9] Full report available at https://edocs.deq.nc.gov/WasteManagement/DocView.aspx?id=765348&dbid=0&repo=WasteManagement&searchid=459afafa-0fdf-48c7-9ef5-21455fc9bfb0.

hazardous waste soils will be loaded and transported to the landfill.”).[10] EPA conducted remedial action from 2023 to 2025,[11] during which Upper Piedmont received 7,527 tons of excavated soil from Cristex. All that soil is waste that the government would otherwise have had to manage and dispose of itself.

35. EPA has been investigating the contamination at Cristex and has identified certain substances, including 1,4 dioxane in the groundwater. **Exhibit F**, Field Investigation Report, at 16 (USEPA June 17, 2021).[12] In accepting waste generated from remedial activities directed by the federal government, RSNC acted under the direction, order, monitoring, and supervision of federal officers.

36. Federal direction and supervision are demonstrated through the activities, plans, and documentation directing disposal of Cristex waste at Upper Piedmont. Not only did EPA state that excavated soil must be disposed of in a RCRA Subtitle D Landfill, ESD at 4, it also directed that the waste be disposed at Upper Piedmont. *See* **Exhibit G**, Special Waste Profile for Cristex Excavation Waste (“Cristex Special Waste Profile”) (excerpt); **Exhibit H**, Agent Special Waste Disposal Services Agreement for Non-Hazardous Substances for Cristex (July 24, 2024) (detailing further requirements and conditions on Upper Piedmont’s acceptance of Cristex waste). When EPA generated waste, it executed and certified a Special Waste Profile. *See* Cristex Special Waste Profile. This means EPA,

---

[10] Full report available at https://edocs.deq.nc.gov/WasteManagement/DocView.aspx?id=2198259&dbid=0&repo=WasteManagement&searchid=59efbdc5-7984-415d-a06d-1125e72d1a1f.

[11] See *Cristex Drum: Cleanup Progress*, EPA (accessed August 13, 2026) (https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.schedule&id=0406597).

[12] Full report available at https://edocs.deq.nc.gov/WasteManagement/DocView.aspx?id=2198259&dbid=0&repo=WasteManagement&searchid=59efbdc5-7984-415d-a06d-1125e72d1a1f.

like USACE at TAMP, conducted an evaluation of the waste composition and physical characteristics, including laboratory analytical testing, and completed a detailed form and certification of load. *Id*. Thus, for the same reasons that the TAMP Special Waste Profile demonstrated compliance with USACE requirements for disposal of TAMP waste, so did the Cristex Special Waste Profile for disposal of Cristex waste.

37. The requirement of "acting under" a federal officer is met here because the alleged contamination of Plaintiffs' drinking water stems in part from RSNC's disposal of federal wastes "that the government would otherwise have to perform itself." *W. Va. State Univ. Bd. of Governors*, 23 F.4th at 301-02 (citing *Watson*, 551 U.S. at 152).

38. In managing and disposing of the remediation waste, RSNC acted under the direction of one or more federal officers. Specifically, RSNC acted in accordance with specifications established by the USACE and USEPA that govern the handling, management, and disposal of waste. For these reasons, RSNC has satisfied the "person acting under" requirement.

### C. Plaintiffs' Claims Against RSNC Are "For or Relating To" Acts Under Color of Federal Office.

39. Under the next requirement, that a defendant's actions were taken "for or relating to any act under color of federal office," 28 U.S.C. § 1442, a defendant must show only a "connection that is not 'tenuous, remote or peripheral'" between the plaintiff's claims and the defendant's acts which were undertaken at the direction of a federal officer. *Plaquemines*, 146 S. Ct. at 1061 (internal quotations omitted); *see also Maryland*, 130 F.4th at 389 ("[A] defendant must show it is being sued for an act or acts that it claims were done

under—or related to acts done under—federal authority."). The phrase "'relating to' sweeps broadly." *Plaquemines*, 146 S. Ct. at 1060; *see also Isaacson,* 517 F.3d at 137 ("The hurdle erected by this requirement is quite low.").[13] "A removing defendant need not establish an airtight case on the merits in order to show the required causal connection." *Maryland*, 130 F.4th at 389 (marks omitted). It is sufficient for a defendant to establish a connection or association between the lawsuit and the federal office, but "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Plaquemines*, 146 S. Ct. at 1060. The court considers whether under defendant's "theory of the case, it plausibly alleged that its charged conduct was related to its federal work." *Maryland*, 130 F.4th at 390; *see also id.* at 389 (the court "credit[s] *Defendants'* theory of the case when determining whether there is such a connection or association.") (emphasis in original). Where, as here, the case involves commingled PFAS, this requirement is "satisfied because PFAS from different sources commingle to the point that it is impossible to identify the precise source of a contaminant." *Maryland*, 130 F.4th at 390. Because "some of the PFAS contamination charged by [plaintiffs]" came from federal-government waste, "any remediation would necessarily implicate work that [defendant] did for the federal government." *Id*.

40. This situation is analogous to that in *Maryland*. Plaintiffs' claims of contamination from Upper Piedmont arise in part from RSNC's acceptance of federal waste

[13] The Fourth Circuit recognized that PFAS cases like these are "likely one[s] where "the acting-under and causal-nexus prongs . . . collapse into a single requirement." *Maryland*, 130 F.4th at 393.

from sites impacted by PFAS and other hazardous substances like 1,4 dioxane. In addition to the federal waste, Upper Piedmont accepts non-hazardous waste from residential, commercial, and industrial customers. When deposited at Upper Piedmont, the federal waste is mixed with other commercial and municipal wastes, which may also contain PFAS and certain substances given its prevalence in consumer products and other waste streams.[14] Constituents in the commingled waste can partition to rainwater infiltrating through a landfill, creating a wastewater known as leachate.[15] The chemical composition of leachate reflects that of the commingled waste such that any substances from government and non-governmental wastes would be inseparable.[16]

41. As discussed above, the federal government waste deposited from TAMP and Cristex in Upper Piedmont very likely contained PFAS and other substances. As such, the Plaintiffs' claims against RSNC are "for or relating to" RSNC's acts taken under color of federal office. 28 U.S.C. § 1442(a)(1); *see, e.g., Albritton v. A Clemente, Inc.,* No. 1:22-cv-00397, 2023 WL 2447422, at *6 (D.N.J. Mar. 10, 2023) (Plaintiff claims arising out of PFAS disposal were connected to federal activities); *Raoul*, 2023 WL 130525, at *3 (same).

### D. RSNC has a Colorable Federal Defense to Plaintiffs' Claims.

---

[14] EPA states that PFAS can be found food packaging, household products, and personal care products. *See* https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas.

[15] "Leachate" means "a liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste. The term 'leachate' does not include liquid adhering to tires of vehicles leaving a sanitary landfill and transfer stations." N.C. Gen. Stat. § 130A-290(16a).

[16] "The type of solid waste that is deposited in a landfill often has a direct correlation to the characteristics of the leachate produced by that landfill." *See Development Document for Final Effluent Limitations Guidelines and Standards for the Landfills Point Source Category,* USEPA, (January 2000), *available at* https://www.epa.gov/sites/default/files/2015-11/documents/landfills-eg_dd_2000.pdf.

42. A removing defendant must show that it has "a colorable federal defense." *Sawyer*, 860 F.3d at 254. To assert a colorable federal defense at the removal stage, the "defense must only be plausible" it does not need to be "clearly sustainable, as the purpose of the statue is to secure that the validity of the defense will be tried in federal court." *Cnty. Bd. of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 254 (4th Cir. 2021). "[A] federal defense is colorable unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 37 (1st Cir. 2022). Instead, RSNC needs only to "raise a claim that is 'defensive' and 'based in federal law'" which is "plausible." *Isaacson*, 517 F.3d at 138; *see also Cnty. Bd. of Arlington Cnty., Va.*, 996 F.3d at 254. A defendant is not required to "win his case before he can have it removed." *Jefferson Cnty.*, 527 U.S. at 431.

43. RSNC has a colorable federal defense based on the government contractor defense as articulated in *Boyle v. United Techs. Corp*., 487 U.S. 500, 505 (1988), which stated that the "uniquely federal interest" of "getting the Government's work done" requires that a private contractor must be protected from tort liability associated with its performance of government contract. The government contractor defense applies where "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id*. at 512.

44. The government contractor defense applies equally to subcontractors. In *Ramey v. Martin-Baker Aircraft Co. Ltd.*, the Fourth Circuit first applied the government contractor defense to a subcontractor. 874 F.2d 946 (4th Cir. 1989). In that case, the plaintiff sued a manufacturer of the Navy's F-18 fighter aircraft and a subcontractor that manufactured the F-18 ejection seat that plaintiff claimed was defectively designed and injured him. The question before the court was whether the district court had properly concluded that the government contractor defense also protected the subcontractor from liability, in addition to the contractor. While relying on the Supreme Court's decision in *Boyle*, which largely adopted the Fourth Circuit's reasoning in *Tozer v. LTV Corp.*, 792 F.2d 403 (4th Cir. 1986), *cert denied*, 487 U.S. 1233 (1988), the Fourth Circuit held the plaintiff "could not surmount the obstacle of the military contractor defense as [] articulated in *Tozer*." *Id.* at 950. The courts in *Tozer* and *Boyle* recognized that if the defense did not apply to entities "getting the government's work done," then "[s]tate court judgments against contractors would effectively pass through to the United States in the form of higher costs." *Ramey*, 874 F.2d at 949-50 (citing *Boyle*, 487 U.S. at 509 (internal citations and quotations omitted)). It was irrelevant that the seat was designed by a subcontractor, so the subcontractor was shielded from liability for the plaintiff's injuries because it satisfied the elements of the government contractor defense as outlined in *Tozer* and *Boyle*. *Id.* at 951; *see also Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 254 (applying government contractor defense to subcontractors).

45. RSNC has satisfied these elements for purposes of removal in that RSNC provided its services for the federal government and its contractors in accordance with the government's waste management requirements and agreed upon special waste specifications, RSNC's services conformed to those requirements and specifications, and the federal government knew at least as much, if not more, as RSNC about the nature of the waste from the government's own properties.

46. Under the first prong, both USACE and EPA approved reasonably precise specifications for the disposal of waste at Upper Piedmont. For the defense to apply, the government need not specify every procedure, it can also approve specifications provided to it by the contractor. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 91 (2d Cir. 2008) ("It is necessary only that the government approve, rather than create, the specifications.") (citation omitted). The requirement of "reasonably precise specifications" can be met by evidence showing that the government's participation "amount[ed] to more than a rubber stamping." *Ramey*, 874 F.2d at 950. RSNC's arrangements with the federal government were plainly subject to "reasonably precise" specifications.

47. First, both the EPA and USACE approved of the contents and requirements of RSNC's Special Waste Profile form and waste disposal agreements which lay out the specifications that must be met in order to accept the waste, including information about odor, color, whether it contained free liquids, physical characteristics, whether it complies with RCRA, volume, contamination source, and laboratory testing data regarding constituents in the waste. A Special Waste Profile was completed for each waste sent to

Upper Piedmont, which were directed and certified by federal officers. At TAMP, USACE also approved work plans governing remediation activities at TAMP. *See* Interim Action Report at 1-1 (referring to USACE's Request for Task Order Proposal and Performance Work Statement and a Uniform Federal Policy for Quality Assurance Project Plan that outlined the excavation procedure). At Cristex, EPA approved the RD Report which stated that excavated soil must be deposited in a RCRA Subtitle D landfill. RD Report at 9-1.

48. Second, Upper Piedmont is a modern landfill constructed in accordance with federally required engineering and pollution control requirements. *See Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*, 504 U.S. 353, 372 (1992) (dissenting opinion) (a "modern landfill is a technically complex engineering exercise that comes replete with liners, leachate collection systems, and highly regulated operating conditions"). Regulatory authorities oversee and verify landfill environmental compliance through extensive permitting and regulation of nearly every aspect of landfill operations that require frequent inspections, financial assurance, operating practices, testing, monitoring, and reporting. *See e.g. Backcountry Against Dumps v. E.P.A.*, 100 F.3d 147, 148 (D.C. Cir. 1996).[17] The extensive regulatory oversight ensures RSNC conforms with the federal government's "reasonably precise" specifications for accepting such waste. The specifications approved by the federal government through the Special Waste Profiles and related documentation were certainly "reasonably precise."

[17] *See, e.g.,* 15A N.C. Admin. Code § 13B .1604 (solid waste permit requirements); 15A N.C. Admin. Code 02H .0126 (NPDES discharge permit requirements).

49. Under the second prong, RSNC's services conformed to those specifications. RSNC accepted remedial waste from the federal government generated at TAMP and Cristex and there are no allegations to the contrary.

50. Under the third prong, the federal government knows as much or more about the waste from its facilities than RSNC. *Albrecht v. A.O. Smith Water Prods.,* No. 11 CIV. 5990 BSJ, 2011 WL 5109532, at *5 (S.D.N.Y. Oct. 21, 2011) ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)).

51. At TAMP, as shown in the Special Waste Profiles, the USACE and its consultants conducted their own detailed analysis of the government's waste, including analytical laboratory testing of the constituents in the waste. Additionally, the USACE conducted investigations of TAMP to identify and delineate PFAS impacts. In fact, it determined that soil from areas adjacent to the excavation area contained PFAS in June 2023, nearly eight months *before* it excavated at TAMP. *Compare* PA-SI issuance date *with* Interim Action Report at 2-1, 2-2.

52. Similarly, the Cristex Special Waste Profiles show that EPA and its consultants conducted the same analyses of the constituents in the waste. Further, EPA has been conducting investigations into the contamination at Cristex for years and has determined that 1,4 dioxane is present at least in the site's groundwater. *See* RD Report, Table 3-6; Field Investigation Report, at 16. Therefore, the government—through USACE

and EPA—is well apprised of the intimate details of the waste characteristics and means of disposal and in a superior position than RSNC.

53. RSNC's disposal of waste was directed by the federal government and performed in accordance with the relevant regulations and specifications. The government contractor defense precludes Plaintiffs from using state tort law to attack RSNC's federal activities.

## **DIVERSITY JURISDICTION EXISTS UNDER THE CLASS ACTION FAIRNESS ACT**

54. This Court also has diversity jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d) and 1453.

55. "CAFA provides the federal district courts with original jurisdiction to hear a class action if the class has more than 100 members, the parties are minimally diverse, and the matter in controversy exceeds the sum or value of $5,000,000." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (internal quotations omitted).

### **I. There Are At Least 100 Members in the Proposed Classes.**

56. The requirement that the class contain at least 100 members is measured by the "proposed plaintiff classes[.]" 28 U.S.C. § 1332(d)(5)(B).

57. Plaintiffs explicitly plead there are at least three hundred fifty members in the proposed class. Compl. ¶ 5.

58. Accordingly, the numerosity prong of CAFA is met.

### **II. Minimal Diversity Exists.**

59. Minimal diversity is present in this matter.

60. Named Plaintiffs are residents of Alamance County, North Carolina and, upon information and belief, are citizens of North Carolina. See Compl. ¶¶ 3–4.

61. Defendant RSNC's sole member is Republic Services, Inc. Republic Services Inc. is a Delaware corporation with its principal place of business in Arizona. Accordingly, RSNC is a citizen of Delaware and Arizona for purposes of diversity jurisdiction. *See* 28 U.S.C. § 1332(c)(1); *Cent. W. Virginia Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011) ("For purposes of diversity jurisdiction, the citizenship of a limited liability company…is determined by the citizenship of all of its members[.]").

62. Thus, minimal diversity exists between Plaintiffs and Defendant.

## III. <u>The Amount in Controversy is Met.</u>

63. The matter in controversy exceeds $5,000,000, exclusive of interest and costs.

64. To calculate the amount in controversy under CAFA, "the claims of the individual class members shall be aggregated[.]" 28 U.S.C. § 1332(d)(6). "[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).

65. "The key inquiry in determining whether the amount-in-controversy requirement is met is not what the plaintiff will actually recover but an estimate of the amount that will be put at issue in the course of the litigation." *Scott v. Cricket Commc'ns, LLC*, 865 F.3d 189, 196 (4th Cir. 2017) (internal quotation omitted).

66. Exclusive of interests and costs, Plaintiffs request:

- Compensatory damages for
  - "removal and remediation of PFOA and PFOS, among other hazardous substances, from their property[,]"
  - "[F]iltration systems that can guarantee no future infiltration by hazardous substances and/or access to public water utility systems as they choose[,]"
  - "[R]epair and restoration of the damaged property, and restoration of the quality of groundwater, well water, and soil[,]"
  - Negligence per se violations,
  - Private nuisance from contamination,
  - Trespass of substances to their properties, and
  - "[F]air market value for hazardous substance storage[;]"
- "[I]njunctive relief from Defendants' ongoing disposal activities[;]"
- "[A]ttorneys fees, costs, and related damages stemming from the contamination of their property [;]"
- Treble damages; and
- Punitive damages.

Compl. ¶¶ 74, 321–330.

67. Plaintiffs have not limited their demand for damages to less than $5,000,000.

68. Plaintiffs allege their damages are of a continuing nature. *Id.* ¶¶ 1, 5, 60, 66, 203, 246, 264, 275, 286, 293.

69. Taken together, the vast nature of the damages sought by Plaintiffs exceed $5,000,000. Plaintiffs allege there are at least 350 members of the class. *Id.* ¶ 5. $5,000,000 divided by 350 comes to $14,286 per class member. Plaintiffs allege extensive and significant contamination of groundwater, well water, and soil throughout the Haw River Basin. See, e.g., Compl. ¶¶ 247–252. Taking Plaintiffs' allegations as true only for purposes of evaluating the amount in controversy, remediating and removing the alleged significant PFAS contamination at each of the properties would cost more than $14,286 per property. Further, this remediation and removal is only one element of Plaintiffs' sought damages. The other compensatory damages, including filtration systems, would also move the amount in controversy over $5,000,000. Plaintiffs also seek to significantly modify the business activities of the nine defendants regarding disposal activities, treble damages, and punitive damages. For these reasons, it is clear Plaintiffs' claims (which RNSC denies) puts more than $5,000,000 in controversy.

WHEREFORE, RSNC hereby removes this action from the General Court of Justice, Superior Court Division, Alamance County, to this Court.

Dated: August 27, 2026

Respectfully submitted:

/s/ *Steven D. Weber*
Steven D. Weber
N.C. State Bar No. 20189
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon Street, Suite 800
Charlotte, North Carolina 28202
Telephone: (704) 372-9000
Email: steveweber@parkerpoe.com

***Attorney for Republic Services of North Carolina, LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served upon all counsel of record by placing a copy of the same in the United States Mail with sufficient postage affixed hereto, addressed as follows:

J. Patrick Longest, III
Andrew R. Shores
F. Bryan Brice, Jr.
Law Offices of F. Bryan Brice Jr.
130 S. Salisbury Street
Raleigh, NC 27603

*Attorneys for Plaintiffs*

This the 27th day of August 2026.

*/s/ StevenD. Weber*
Steven D. Weber
N.C. State Bar No. 20189
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon Street, Suite 800
Charlotte, North Carolina 28202
Telephone: (704) 372-9000
Email: steveweber@parkerpoe.com

***Attorney for Republic Services of North Carolina, LLC***